IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DEBORAH BJORMAN,

                        Plaintiff,

        vs.

ALEGENT HEALTH - BERGAN MERCY
HEALTH SYSTEMS,

                        Defendant.

**8:21CV259**

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

This case arises from plaintiff Deborah Bjorman's pay dispute and allegedly retaliatory discharge from her position as a neonatal nurse practitioner with defendant Alegent Health – Bergan Mercy Health System (Alegent). This case is now before the Court on Alegent's Motion for Summary Judgment on all of Bjorman's claims. Filing 47. For the reasons stated below, Alegent's Motion for Summary Judgment is granted.

## I.   INTRODUCTION

The Court's ability to address Alegent's Motion for Summary Judgment effectively and efficiently has been seriously hampered by Bjorman's noncompliance with NECivR 56.1 in her responses to Alegent's statement of material facts. The version of NECivR 56.1(b)(1) in effect at the time[1] required that "[e]ach material fact in the [opposing party's] response [to the moving party's statement of material facts] must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must

---

[1] The Motion now before the Court was filed before a new version of the Court's local rules—including considerable revision to NECivR 56.1—went into effect on December 1, 2022.

state the number of the paragraph in the movant's statement of material facts that is disputed." NECivR 56.1(b)(1). Bjorman's noncompliance with this rule includes failing to provide proper citations to evidence supporting disputes of fact; failing to specifically admit or controvert Alegent's factual statements; failing to indicate the undisputed parts of statements that are admitted or disputed only in part; stating unrelated facts in response to Alegent's factual statements; and providing responses so unhelpful that they confuse rather than clarify what facts are undisputed.

The local rule in effect at the time also provided in part, "<u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response</u>." NECivR 56.1(b)(1) (emphasis in the original). Thus, the Court could reject any inadequate attempts to controvert Alegent's individual factual statements. The Court declines to address statement-by-statement which of Alegent's statements Bjorman has not effectively controverted, however, given the extent of the problem in this case. Such a course would be particularly unnecessary and inefficient where the Court concludes that the pending motion can be resolved by considering a smaller and more straightforward group of facts than the parties have offered. Furthermore, the Court's recitation of the material facts below will adequately demonstrate the problems with Bjorman's responses to Alegent's factual statements.

### A. The Pertinent Factual Background

The Court ordinarily states that unless otherwise indicated the facts set out in its statement of the factual background are undisputed. The Court cannot do so in this case because it seems that nearly all facts are disputed—although not necessarily genuinely or properly.

1.   *The Parties*

It appears undisputed that "Alegent is a hospital that employs individuals working in Douglas County, Nebraska." Filing 47-1 at 8 (¶ 2).[2] On or about July 16, 2001, Bjorman began employment as a registered nurse in the neonatal intensive care unit (NICU) at Alegent Health Bergan Mercy Medical Center. Filing 47-1 at 8 (¶ 4); Filing 53 at 10 (¶ 3). Alegent Health Bergan Mercy was later integrated into Alegent's organization. Filing 47-1 at 8 (¶ 4). In July 2006, Bjorman moved into the role of Neonatal Nurse Practitioner (NNP) in the NICU, and she also performed consults in the labor and delivery department and the nursery. Filing 47-1 at 8 (¶ 5). Alegent alleges that at the time that her employment ended in June 2019, Bjorman was a .9 full-time equivalent (FTE) employee, meaning that she was expected to work 36 hours per week or 72 hours per pay period (*i.e.*, .9 of a standard 40-hour work week and 80-hour pay period). Filing 47-1 at 8 (¶ 6). Bjorman admits this allegation "in part," but it is not clear in which part. Filing 53 at 4 (¶ 6). She adds "that she was a non-exempt FTE [employee] paid by [Alegent] on an hourly basis," but that statement does not controvert Alegent's allegation. Filing 53 at 4 (¶ 6).

2.   *The PTO Pay Dispute*

As mentioned at the outset of this opinion, Bjorman's claims against Alegent arise out of a pay dispute, but there appears to be considerable confusion between the parties as to the nature

---

[2] The Court must say this fact "appears undisputed," because Bjorman's response to Alegent's statement is an example of one that is unhelpful, in that it creates more uncertainty than it resolves. It states, "Defendant [sic] admits this allegation to the extent it does not conflict with Paragraph 4 of Defendant's Answer and Affirmative Defenses." Filing 53 at 4 (¶ 2). Such a response does not controvert the allegation or clarify it in any way. *See* NECivR 56.1(b)(1). This so, because ¶ 4 of Bjorman's Complaint states, "Upon information and belief, the Defendant is an employer located in Douglas County, Nebraska. The Defendant is an employer as that term is defined pursuant to the applicable state and federal statutes set forth herein." Filing 1-1 at 4 (¶ 4). Alegent's Answer states, "Paragraph 4 contains conclusions of law for which no response is required. To the extent a response is required, Alegent admits it employs individuals working in Douglas County, Nebraska, and denies all remaining allegations or implications contained in Paragraph 4." Filing 5 at 2 (¶ 4). The only difference between the statement quoted in the body of this decision and the admission in Alegent's Answer is that the statement quoted in the body adds the information that Alegent "is a hospital." Bjorman does not appear to dispute that Alegent "is a hospital" where she admits she was employed with "Alegent Health Bergan Mercy Medical Center" beginning in 2001. Filing 47-1 at 8 (¶ 4); Filing 53 at 4 (¶ 4).

of Bjorman's complaints about her pay. What is clear is that Alegent's paid time off (PTO) "policy" or "practice" is at the center of the dispute at summary judgment. *Compare, e.g.,* Filing 47-1 at 9 (¶¶ 7–10), *with* Filing 53 at 4 (¶¶ 7–10). As the Court understands Bjorman's claim— from her responses to Alegent's statement of facts in support of summary judgment, her own statement of additional facts, and her briefing[3]—Bjorman (and other employees) believed that they were allowed or required to use PTO hours to bring their hours up to their FTE in a week of the pay period when they did not actually work enough hours, even if they had worked hours over their FTE in the other week of the pay period. Filing 53 at 10 (¶ 5); Filing 53 at 9 (¶ 1). Bjorman alleges that as early as 2014 and continuing until April 2016, Alegent was improperly manipulating timecards of employees working in the NICU and other departments by removing PTO hours even if the employees were not up to their FTE in one week of the pay period. Filing 53 at 9 (¶ 1). Alegent alleges the PTO hours "removed" from the timecards were "returned" to the employees' PTO balances for future use. Filing 47-1 at 9 (¶ 10). In contrast, Bjorman asserts that PTO hours could not be "returned" if the employee was already at the annual cap for PTO hours, so she did not accrue additional PTO, and she lost wages and benefits. Filing 47-1 at 9 (¶¶ 8–10); Filing 53 at 4 (¶¶ 8–10).

Bjorman alleges that she raised her concerns about PTO with Alegent over approximately two-and-a-half years prior to her termination. Filing 53 at 5 (¶ 11). She also asserts that Lauren Westerdale, one of her supervisors, told her in January 2019 that if she did not drop the PTO issue, Bjorman "wouldn't like the outcome." Filing 53 at 16 (¶ 44). In response, Alegent states that

---

[3] Alegent might be excused some of its confusion about Bjorman's claim relating to PTO, because the claim as described in the body of this decision—based on Bjorman's submissions in opposition to summary judgment—bears no resemblance to the claim alleged in Count I of Bjorman's Complaint, as explained in more detail in the legal analysis in section II.B.2. of this decision.

Bjorman admits that she did not ask what Westerdale meant by her comment and that Westerdale denies that she told Bjorman to drop the PTO issue. Filing 60 at 12 (¶ 44).

### 3. *The Licensure Issue*

The parties agree that in October 2017, Alegent informed all NNPs including Bjorman that they would be required to obtain an Iowa nursing license to support patient care at another CHI Health facility. Filing 47-1 at 11 (¶ 25). Alegent alleges that it communicated this expectation and provided instructions to Bjorman and the other NNPs via email on October 19, 2017, and November 8 and 9, 2017. Filing 47-1 at 11 (¶ 26). Bjorman disputes this statement, but she does so without citing any contrary evidence. Filing 53 at 7 (¶ 26). Bjorman adds that there was no clear deadline articulated for obtaining a license and that Alegent "did not communicate a concern with obtaining the license." Filing 53 at 7 (¶ 26).

Alegent alleges that, over a year later, on January 23, 2019, it issued Bjorman a written Final Warning and presented her with a performance improvement plan, which required Bjorman to provide proof of her completed license application by January 25, 2019, and to submit weekly reports concerning the status of her application until complete, with a goal of obtaining her Iowa license and registration by the end of March. Filing 47-1 at 12 (¶ 29). Bjorman alleges that this warning came just three days after the meeting at which Westerdale told her to drop the PTO issue and that Alegent had not previously expressed concern about her licensing. Filing 53 at 17 (¶¶ 49). Alegent alleges that the written Final Warning also stated that it would be valid for 12 months from the date given and that Bjorman "is not in good standing during this timeframe." Filing 47-1 at 12 (¶ 31). The Final Warning submitted to the record states in pertinent part,

Comment:
- Deborah needs to provide validation that IA application process is pending and receipts for payment of fees by 1/25/19.
- Once validation that IA process has begun, Deborah needs to submit weekly report to NICU Director on progress of application process until complete and IA DEA obtained.
- Final warning is valid for 12 months from the date given and employee is not in good standing during this timeframe.

Filing 49-4 at 9 (Exh. 16). In response to Alegent's statement in ¶ 29, Bjorman admits only that a warning was issued, then adds that she did not fail to obtain the Iowa license as Alegent requested. Filing 53 at 7 (¶ 29). In response to the statement that she would not be in good standing during the twelve months after the warning, Bjorman admits the statement "only to the extent this [statement] does not conflict with the document cited, being Exhibit 16." Filing 53 at 7 (¶ 31). This caveat confuses more than it clarifies, in light of the language of Exhibit 16 quoted above. Bjorman then adds that she obtained an Iowa nursing license in February 2019, that she kept her employer informed during the entire process, and that she made clear the issues she was having with getting her license that were outside of her control. Filing 53 at 7 (¶ 31). These additional facts may be interesting—possibly even material—but they do not controvert any part of Alegent's allegations in ¶ 31 of Alegent's statement of facts. Alegent admits that Bjorman obtained her Iowa nursing license in February 2019. Filing 60 at 13 (¶ 50).

### 4. *The Patient Care Incident*

Alegent alleges that, on or about May 27, 2019, it received a report that on May 26, when called for a consult in the nursery, Bjorman did not listen to or assess the patient but nevertheless charted that she had conducted a complete assessment. Filing 47-1 at 12 (¶ 33). Bjorman admits "only that a report was made by an unknown person regarding a consult [she] performed on May 26, 2019," but Bjorman "dispute[s] all other allegations in this paragraph." Filing 53 at 7 (¶ 33). Alegent alleges the following concerning this incident:

> As part of the overall investigation into the report, Alegent conducted interviews and obtained witness statements. During the investigation into

[Bjorman's] conduct, a nurse reported that, "[Bjorman] did not listen to or touch the baby," but "charted a full assessment after the consult was complete." This nurse also reported that [Bjorman] "took one look at the baby and said 'Oh this baby is just fine—she is just hungry.'" A second nurse also reported that [Bjorman] did not do a hands-on assessment of the neonatal patient. One witness stated that she had no recollection of a stethoscope being used to evaluate the baby and confirmed [Bjorman] "looked at the baby and said it was starving." The witness statement about the stethoscope led Lauren Westerdale, one of [Bjorman's] supervisors, to conclude that no evaluation was performed on the neonatal patient.

Filing 47-1 at 13 (¶¶ 34–39) (paragraph numbers and internal citations omitted). Bjorman's response to each of these allegations is the same: "Dispute. [Bjorman] conducted the examination and [Alegent's] investigation failed to include interviews or statements from persons with firsthand knowledge," and cites ¶¶ 57–68 of her own statement of additional facts. Filing 53 at 8 (¶¶ 34–39). It is not clear whether Bjorman disputes that the statements attributed to witnesses were made, disputes the truth of such statements, or both.

Bjorman's statements about the incident and the investigation, to the extent the Court concludes that they state material facts or potentially material facts, are the following:

> [Bjorman] conducted a neonate consult in the Bergan Mercy newborn nursery on or about May 26, 2019, and documented her examination of the neonate at approximately 2:30 a.m. on that date. [Bjorman] spoke with a pediatrician, Dr. Tina Scott Mordhorst, at approximately 6:00 a.m. following the examination. Despite the fact no one was present during the examination, an unknown person submitted an Incident Reporting Information System ("IRIS") report internally to [Alegent], claiming that the examination conducted by [Bjorman] never occurred. . . . [Alegent] has admitted it is aware that no other nurses accompanied [Bjorman] to the May 26, 2019 consult [Bjorman] conducted of the neonate in the newborn nursery, and based its conclusion from the statement of a RN, Deborah Rasmussen, who "did not recall" whether a stethoscope was used during the examination. [Alegent] failed to interview the nurse that assisted [Bjorman] with obtaining a thermometer for the examination of the neonate and failed to interview any nurse within close proximity of the May 26, 2019 examination. [Alegent's] human resources department did not investigate the witness statements provided by the nurses who were not present for the examination. A "memorandum of record" created by Westerdale summarizing her notes was not submitted to anyone internally at CHI.

Filing 53 at 19 (¶¶ 57–59), 20–21 (¶¶ 65–68) (paragraph numbers and internal citations omitted).[4]

The parties agree that on or about June 14, 2019, Lauren Westerdale, Rachel Butler (another of Bjorman's supervisors), and Lisa Strasheim met with Bjorman to discuss the concerns raised in the report, and they suspended Bjorman pending further investigation into her conduct. Filing 47-1 at 13 (¶ 40). Alegent alleges that it also communicated with the pediatrician who had requested the consult, and the pediatrician stated that Bjorman had failed to follow up with the treating pediatrician. Filing 47-1 at 13 (¶ 41). Bjorman responds that this statement is "Dispute[d]," and adds that she "spoke with the pediatrician a mere hours after she performed the consult, which the pediatrician admitted." Filing 53 at 8 (¶ 41). It is not clear whether Bjorman disputes that Alegent communicated with the pediatrician or disputes what the pediatrician reported. Also, an allegation that Bjorman "spoke with the pediatrician" a few hours after she performed the consult does not controvert Alegent's allegation that Bjorman did not follow up with the treating physician. Alegent points out that Bjorman admitted in her deposition that she did not call Dr. Scott; rather, Dr. Scott called her. Filing 60 at 15 (¶ 58) (citing Filing 56-2 at 58 (Bjorman Depo., 225:21–226:5)).

Alegent alleges that it "[u]ltimately . . . concluded based on interviews that [Bjorman] 'did not conduct a complete examination on this baby that she said she had.'" Filing 47-1 at 14 (¶ 42). Again, Bjorman disputes this statement and adds, "Plaintiff [sic] based its conclusion on

---

[4] The paragraphs omitted from the statement above on the ground that the Court does not find them material state the following:

> Submission of internal IRIS reports were incentivized by a monthly "reporting contest" at CHI which began in 2018. Pursuant to Defendant's IRIS policy, an employee creating an IRIS report should be a person with "firsthand knowledge" of the incident. Pursuant to Defendant's IRIS policy, the report should not record "opinions" or "conclusions." Pursuant to Defendant's IRIS policy, the reviewer of the report is required to complete the "necessary follow-up and close the incident within seven calendar days of the event being entered into IRIS." Defendant informed and other NNPs in the Bergan NICU that IRIS reports were "not meant to be punitive or to get anyone in 'trouble'".

Filing 53 at 19–20 (¶¶ 60–64) (paragraph numbers and internal citations omitted).

information from persons who were not present when [Bjorman] performed the examination on May 26, 2019." Filing 53 at 9 (¶ 42). Again, it is not clear whether Bjorman disputes that Alegent reached a conclusion, disputes what the conclusion was, or disputes the correctness of the conclusion. Her additional statement does not actually controvert Alegent's allegation, even if it is intended to suggest that Alegent's investigation was inadequate.

### 5. *Bjorman's Termination*

Alegent alleges that on June 17, 2019, Bjorman was called in for a meeting "to discuss the results of the investigation." Filing 47-1 at 14 (¶ 43). Bjorman disputes this statement alleging instead that she "was called to a meeting to be wrongfully terminated by [Alegent]." Filing 53 at 9 (¶ 43). Alegent alleges that at the meeting, Alegent told Bjorman her employment was being terminated for negligence and fraudulent documentation in a medical record, after a full investigation that confirmed the complaints against her. Filing 47-1 at 14 (¶ 44). Bjorman reiterates her response to ¶ 43 as her response to ¶ 44, which does not explain what is disputed. Alegent alleges that at the time of the incident, Bjorman was not in good standing because of the Final Warning issued for her failure to obtain her Iowa nursing license in a timely manner. Filing 47-1 at 14 (¶ 47). Bjorman gives the vague response that this statement is "dispute[d]" then adds that she "obtained her Iowa license months prior to May 26, 2019." Filing 53 at 9 (¶ 47). Bjorman points to nothing in the record as demonstrating that obtaining her Iowa license prior to the May 26, 2019, incident returned her to good standing after the Final Warning or anything in the record otherwise controverting Alegent's statement.

Bjorman points out that after Alegent submitted information about the May 26, 2019, incident to the Nebraska Department of Health and Human Services following her termination, the Nebraska Attorney General's Office declined to take any disciplinary action. Filing 53 at 21 (¶ 70). Alegent counters that this fact is not material to the outcome of the issues identified in its Motion.

Filing 60 at 19 (¶ 70). Bjorman also alleges that following her termination, she was without full-time work as an NNP for approximately 18 months. Filing 53 at 22 (¶ 74). Alegent contends that this fact is also not material to the outcome of the issues identified in its Motion. Filing 60 at 20 (¶ 74).

## B.  Procedural Background

Bjorman filed her Complaint in this action in the District Court for Douglas County, Nebraska, on June 9, 2021. Filing 1-1. In it, Bjorman asserts three Counts. In Count I, she alleges Alegent violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, "when forcing employees to use PTO to meet a 40 hour work week and by retaliating against the Plaintiff after she engaged in a protected activity of reporting illegal conduct of the Defendant." Filing 1-1 at 7 (¶ 24). In Count II, Bjorman alleges that Alegent violated the Nebraska Wage Payment and Collection Act (NWPCA), Neb. Rev. Stat. § 48-1201 *et seq.*, "by refusing to compensate Plaintiff in a manner required under said law for overtime work performed by the Plaintiff and retaliating against the Plaintiff after she opposed the Defendant's illegal activities." Filing 1-1 at 8 (¶ 27). In Count III, Bjorman alleges that Alegent violated both Neb. Rev. Stat. § 48-1101 *et seq.*, which is the Nebraska Fair Employment Practice Act (NFEPA), and Nebraska public policy when it "retaliated against the Plaintiff after she reported and/or opposed a practice and/or action of the Defendant which she believed was unlawful under state or federal law." Filing 1-1 at 9 (¶ 30). Alegent removed this action to this federal court on July 12, 2021, Filing 1, then filed an Answer on July 19, 2021, Filing 5. On August 26, 2022, Alegent filed the Motion for Summary Judgment now before the Court.

## II. LEGAL ANALYSIS

### A. Standards for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute." *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the . . . absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649, 652 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019). "The Supreme Court's 'repeated' admonition is that 'the plaintiff, to survive the defendant's [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor.'" *Doe by next friend Rothert v. Chapman*, 30 F.4th 766, 772 (8th Cir. 2022) (quoting *Anderson*, 477 U.S. at 257). Nevertheless, "[t]he nonmovant must do

more than simply show that there is some metaphysical doubt as to the material facts, but must provide specific facts showing that there is a genuine issue." *Dowden, Tr. of Est. of Hugh Dana Huchingson v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021) (internal quotation marks and citations omitted).

The Court will apply these standards in turn to each Count of Bjorman's Complaint.

## B. Bjorman's FLSA Claims

In Count I of her Complaint, Bjorman alleges Alegent violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, in two ways. Alegent seeks summary judgment on these claims.

### 1. *The Parties' Arguments*

Alegent understands Bjorman to be making two separate FLSA claims: (1) that Alegent "forc[ed] employees to use PTO to meet a 40 hour work week" and (2) that Alegent "retaliate[ed] against Plaintiff after she reported this allegedly illegal conduct." Filing 47-1 at 16. Alegent argues that Bjorman's FLSA claim based on her allegation regarding PTO is not a cognizable FLSA claim, because the FLSA regulates minimum wages and overtime wages, not paid time off. Filing 47-1 at 16–17. Alegent argues that if the FLSA claim is viable it is time-barred, because the alleged violations ended in April 2016, but Bjorman waited more than three years until June 2021 to file this lawsuit. Filing 47-1 at 17–18. Alegent argues that Bjorman's FLSA retaliation claim also fails because the conduct she reported did not arise under the FLSA. Filing 47-1 at 18, 20–21. Alegent argues further that it terminated Bjorman's employment for a legitimate, non-retaliatory, and non-pretextual reason, that is, her negligence and fraudulent documentation of her treatment of a neonatal patient while she was on a written Final Warning for failure to obtain her Iowa license in a timely manner. Filing 47-1 at 18–19, 21–23. Alegent argues that Bjorman's conduct concerning the consult was "egregious," that Alegent adequately investigated the incident, and that it

legitimately terminated Bjorman for it. Filing 47-1 at 24–25. Finally, Alegent argues that Bjorman cannot generate genuine issues of material fact that the reasons for her termination were pretextual, where Alegent was entitled to believe the reports about Bjorman's inadequate care of the neonate. Filing 47-1 at 25–26.

Bjorman contends that her FLSA claim is cognizable because she was not paid wages due her, when Alegent removed PTO hours from her timecard if she worked overtime in one week of a two-week period. Filing 53 at 23. Bjorman contends this conduct punished her for working overtime in one week by not paying her up to her FTE for the other week. Filing 53 at 23. She contends that the evidence demonstrates that, even though she was required to use PTO to reach her weekly FTE hours (36 hours) if she had worked overtime the week prior, she was not paid her hourly wage for those hours because the PTO hours were removed from her timecard for at least a two-year period from 2014 to 2016. Filing 53 at 24. As to her FLSA retaliation claim, Bjorman argues that she made protected complaints about non-payment for the removed PTO hours. Filing 53 at 25–27. She contends that she was terminated after two-and-a-half years of asking about the status of the investigation of the PTO issue and after being told to drop the issue. Filing 53 at 25, 28–30. Bjorman also contends that Alegent's licensure and negligence reasons for her termination are pretextual because she did obtain her license and there is conflicting material evidence about the incident in May 2019. Filing 53 at 31–34.

In reply, Alegent argues that Bjorman tries to "cobble together" a cognizable FLSA claim by arguing that Alegent did not allow her to use PTO hours to reach her FTE for a single week, resulting in non-payment of wages, but Bjorman lacks any plausible explanation of how this prohibition would constitute non-payment of wages for hours worked. Filing 61 at 3. Furthermore, Alegent argues that Bjorman's misconduct with regard to her licensing and during the May 2019

13

consult are precisely the type of intervening events between protected activity and termination that eliminate the causal connection. Filing 61 at 5. Finally, Alegent argues that Bjorman's conclusory assertions do not generate genuine issues of material fact on whether her termination was pretextual. Filing 61 at 6–7.

2. *Bjorman's FLSA Claim Concerning PTO in Opposition to Summary Judgment Is Not the Claim Alleged in Her Complaint*

As mentioned above, in Count I of her Complaint, the first violation of the FLSA that Bjorman alleges is that Alegent "forc[ed] employees to use PTO to meet a 40 hour work week." Filing 1-1 at 7 (¶ 24). Specifically, in her Complaint, Bjorman alleges the following:

> 8. On or around April 18, 2016, Supervisor for Neo-Natal Nurse Practitioners Sarah Mayhue ("Mayhue") told Plaintiff that Defendant's practice had been to use PTO hours to balance out full time weekly hours in a pay period for employees, even if the employee had worked 60 hours one week, and not worked the required 36 hours per week in the other week of the pay period.

> For example, for Week 1, an employee worked 60 hours. Of those 60 hours, 40 hours are paid at the normal rate and 20 hours are overtime pay. But on week 2, if employee works 12 hours, then the employee would have to use 24 hours of PTO time to compensate for not working a full-time week. Employee is unable to "bank" any more PTO hours because [her] limit has been reached. Employee loses 24 hours of earned PTOs. Employee also loses additional funds in retirement account or 401K. Employee loses additional income that pay period.

> 9. Employee's loss of Paid Time Off hours resulted in loss of earned income, loss of income for the pay period, and loss of funds placed into retirement accounts.

Filing 1-1 at 4–5 (¶¶ 8–9).

In her response to Alegent's statement of facts, in her own statement of facts, and in her Opposition Brief, however, Bjorman relies on a different claim concerning PTO to attempt to defeat summary judgment. As set out in Section I.A.2. above, Bjorman's PTO pay dispute claim as set out for purposes of summary judgment relies on Bjorman's (and other employees') belief that they were required to use PTO hours to bring their hours up to their FTE in a week of the pay

14

period when they did not actually work enough hours, even if they had worked hours over their FTE in the other week of the pay period. Filing 53 at 10 (¶ 5); Filing 53 at 9 (¶ 1). That much is consistent with her Complaint. What is inconsistent is that she then alleges that as early as 2014 and continuing until April 2016, Alegent was improperly manipulating timecards of employees working in the NICU and other departments by removing PTO hours even if the employees were not up to their FTE in one week of the pay period. Filing 53 at 9 (¶ 1). Bjorman disputes Alegent's contention that the PTO hours cut from their timecards were "returned," because she asserts that PTO hours could not be "returned" if an employee was already at the annual cap for PTO hours, so she did not accrue additional PTO, and she lost wages and benefits. Filing 47-1 at 9 (¶¶ 8–10); Filing 53 at 4 (¶¶ 8–10).

Thus, the gravamen of Bjorman's claim as formulated for purposes of resisting summary judgment is that Alegent wrongfully removed PTO hours for a week with a shortfall in hours actually worked. That is the opposite of the claim alleged in Bjorman's Complaint that she was required to use PTO hours to reach her FTE in a week with a shortfall in hours actually worked. Bjorman has never pleaded the claim relating to removal of PTO from timecards that she now asserts in response to Alegent's Motion for Summary Judgment.

As the Eighth Circuit Courts of Appeals has made clear,

The pleading requirements under the Federal Rules of Civil Procedure, while "relatively permissive," "do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *Singleton v. Arkansas Hous. Auth. Prop. & Cas. Self-Insured Fund*, 934 F.3d 830, 837 (8th Cir. 2019). *See WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 993 (8th Cir. 2018) (noting that defendant had notice of alleged grounds for breach of contract and was entitled to tailor its defense accordingly; "it was not required to intuit additional theories of liability that were not apparent from [plaintiff's] complaint."); *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (where complaint lacked allegations that would notify defendant of claim, party could not manufacture claim late in litigation to avoid summary judgment).

15

*Wendt v. Iowa*, 971 F.3d 816, 821 (8th Cir. 2020). The Court will not allow Bjorman to manufacture a new FLSA claim concerning PTO to try to avoid summary judgment in this case.

Moreover, Bjorman's reformulation of her FLSA claim concerning PTO in opposition to summary judgment effectively waives or abandons whatever FLSA claim concerning PTO Bjorman pleaded in her Complaint and on which Alegent sought summary judgment. As the Eighth Circuit Court of Appeals has explained,

> The "failure to oppose a basis for summary judgment constitutes waiver of that argument," because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs*., 558 F.3d 731, 735 (8th Cir. 2009). "It was not the District Court's responsibility to sift through the record to see if, perhaps, there was an issue of fact." *Id.* at 735. Thus, even if Paskert had properly pled a sex discrimination claim, her failure to oppose such a claim on summary judgment means she waived the argument on appeal.

*Paskert v. Kemna-ASA Auto Plaza, Inc*., 950 F.3d 535, 540 (8th Cir.), *cert. denied*, 141 S. Ct. 894 (2020); *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) ("By not opposing the Red Cross motion for summary judgment on her claims that she was not promoted to the DOT Administrator and Administrative Assistant positions due to race discrimination, Robinson has waived those claims." (citing *Satcher*, 558 F.3d at 735)).

In short, the Court never reaches the question of whether or not the PTO claim is cognizable under the FLSA or whether it is timely. Instead, Alegent is entitled to summary judgment on the FLSA claim concerning PTO because Bjorman cannot manufacture a claim to defeat summary judgment and she waived or abandoned the FLSA claim concerning PTO that she had pleaded.

### 3. *No Reasonable Jury Could Find for Bjorman on Her FLSA Retaliation Claim*

The purpose of the FLSA is "to maintain a 'standard of living necessary for health, efficiency, and general well-being of workers.'" *Gamble v. Minnesota State-Operated Servs*., 32 F.4th 666, 670 (8th Cir. 2022) (quoting *McMaster v. Minnesota*, 30 F.3d 976, 980 (8th Cir. 1994)).

Among other things, the FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee [for] fil[ing] any complaint or institut[ing] . . . any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). Bjorman has both pleaded her FLSA retaliation claim and defended it at summary judgment. Nevertheless, no reasonable jury could find in her favor on that claim in light of the evidence presented. *See Chapman*, 30 F.4th at 772 (stating this summary judgment standard).

"To survive a motion for summary judgment on a [FLSA] retaliation claim, [a plaintiff] either must offer direct evidence of retaliation or create an inference of retaliation under the *McDonnell Douglas [Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] burden-shifting framework." *Yearns v. Koss Constr. Co.*, 964 F.3d 671, 674 (8th Cir. 2020) (quoting *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016)). Thus, where a plaintiff presents no direct evidence—and Bjorman has pointed to none—courts apply the burden-shifting framework under *McDonnell Douglas. Id.* More specifically,

> At step one of the *McDonnell Douglas* framework, the employee must first establish a prima facie case of retaliation, which requires the employee to show that "[s]he participated in statutorily protected activity, that [the employer] took an adverse employment action against h[er], and that there was a causal connection between them." *Grey [v. City of Oak Grove]*, 396 F.3d [1031,] 1034-35 [(8th Cir. 2016)]. At step two, the burden shifts to the employer to articulate legitimate, non-retaliatory reasons for the discharge. *See id.* at 1035. Finally, at step three, the burden shifts back to the employee to show that the "legitimate, nonretaliatory reasons articulated by [the employer] were not the true reasons for discharge, but merely a pretext for retaliation." *Id.*

*Yearns*, 964 F.3d at 674–75. Courts may assume that the first two steps are satisfied, so that the only question they must consider is "whether [the plaintiff] has presented sufficient evidence to create a genuine issue of material fact that [the defendant's] proffered reason is mere pretext for retaliation." *Id.* at 675.

Proof of pretext means showing "that the employer's proffered reason is unworthy of credence." *Engelhardt v. Qwest Corp.*, 918 F.3d 974, 979 (8th Cir. 2019). The Eighth Circuit Court of Appeals has explained,

> In the retaliation context, there are "at least two routes for demonstrating a material question of fact as to pretext: first, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact; or, second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). Creating a genuine issue of material fact regarding pretext "requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (alterations omitted) (internal quotation marks omitted). For instance, "timing alone is not enough to establish pretext, even if it can 'create an inference of retaliation' at step one." *Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1109 (8th Cir. 2020) (citations omitted) (quoting *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 738 (8th Cir. 2013)).

*Yearns*, 964 F.3d at 675. Where uncontroverted evidence supports the employer's reasons for adverse action, the plaintiff has failed to demonstrate pretext. *Engelhardt*, 918 F.3d at 981.

In this case, Bjorman contends that Alegent's lack of licensure and negligence justifications for her termination are pretextual because she did obtain her license and there is conflicting material evidence about the incident in May 2019. Filing 53 at 31–34. The Court is not persuaded, first, because Bjorman cannot show that there is no basis in fact for the Final Warning over licensure or for disciplining her for the subsequent May 2019 incident. *See Yearns*, 964 F.3d at 675 (recognizing that one way to show pretext is to show "the proffered explanation has no basis in fact").

Specifically, Bjorman does not and cannot dispute that she did not obtain her Iowa nursing license until February 2019. Filing 53 at 7 (¶ 31) (alleging that she did not obtain her license until February 2019). Thus, there was a factual basis for the Final Warning about her failure to obtain her license in January 2019. Although Bjorman seems to suggest that the Final Warning is suspect,

18

because it was given just three days after she complained to Westerdale about the PTO issue, a complaint about an employer's conduct or practices "does not insulate an employee from the consequences of violating company policy." *Cf. Hairston v. Wormuth*, 6 F.4th 834, 844 (8th Cir. 2021) (Title VII case) (quoting *Des Moines Bolt Supply*, 626 F.3d 410, 417 (8th Cir. 2010)). Nothing in the record suggests more than an insufficient "metaphysical doubt" that the Final Warning was itself motivated by a retaliatory animus rather than by Bjorman's failure to comply with the licensing requirement. *See Dowden*, 11 F.4th at 872.

Bjorman's contention that there is conflicting material evidence about the incident in May 2019, which immediately preceded her termination, does not demonstrate that there was no factual basis for the finding that she engaged in misconduct in that incident. Alegent has identified the factual basis—after investigation—on which it concluded that Bjorman had engaged in that misconduct. Filing 47-1 at 13 (¶¶ 34–39). Even if Bjorman disputes the statements about the evidence—and her response to each of them is the same: "Dispute. [Bjorman] conducted the examination and [Alegent's] investigation failed to include interviews or statements from persons with firsthand knowledge," Filing 53 at 8 (¶¶ 34–39)—her responses do not clearly indicate whether she disputes that the statements attributed to witnesses were made, disputes the truth of such statements, or both. Her vague "disputes" and her own statements about the incident, Filing 53 at 19 (¶¶ 57–59), 20–21 (¶¶ 65–68), fall well short of controverting Alegent's factual basis for terminating her. Furthermore, as the Eighth Circuit Court of Appeals explained, an employee's "denials and justifications [for violating the employer's policies] [a]re not evidence that [the employer] fabricated the charges." *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1035–36 (8th Cir. 2005). Rather, "[t]he question is whether [the employer's] articulated reasons for discharge were a pretext for retaliation, not whether [the employee] actually did what [s]he was accused of

19

doing or whether discharge was warranted." *Id.* Where there was a factual basis for Bjorman's discharge for misconduct in May 2019, there is no inference of fabrication and consequently no inference of pretext.

Furthermore, no reasonable juror could find that Bjorman's evidence shows "that a prohibited reason more likely motivated the employer." *Yearns*, 964 F.3d at 675 (recognizing this as another way to show pretext). In this case, not only did Alegent have a factual basis for its conclusion that Bjorman had engaged in misconduct in May 2019, Alegent had evidence that she did so while she was not in good standing because of the Final Warning for a prior failure to meet Alegent's requirements for licensing. Bjorman admits Alegent's statement that she would not be in good standing during the twelve months after the Final Warning "only to the extent this [statement] does not conflict with the document cited, being Exhibit 16." Filing 53 at 7 (¶ 31). That caveat avails her nothing, because what the Final Warning states is precisely that she would not be in good standing for twelve months after it was given. Filing 49-4 at 9 (Exh. 16). Bjorman points to nothing in the record that demonstrates that obtaining her Iowa license prior to the May 26, 2019, incident returned her to good standing after the Final Warning or anything in the record otherwise controverting Alegent's statement that she was not in good standing at the time of the incident. A contention that Bjorman was returned to good standing upon obtaining her Iowa nursing license would be nothing more than a conclusory assertion with no factual basis. Such "[c]onclusory [assertions], standing alone, cannot create a genuine issue of material fact precluding summary judgment." *Yearns*, 964 F.3d at 677 (quoting *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998)). Thus, where Bjorman already was not in good standing at the time of the May 2019 incident, no reasonable juror could infer that her termination was so out of proportion to the misconduct at issue as to suggest a retaliatory motive was more likely the reason

for her termination than the misconduct itself. *See Chapman*, 30 F.4th at 772 (stating this summary judgment standard).[5]

Alegent is entitled to summary judgment on Bjorman's FLSA retaliation claim as well as her FLSA claim concerning PTO.

### C.  Bjorman's NWPCA Claims

In Count II of her Complaint, Bjorman alleges that Alegent violated the Nebraska Wage Payment and Collection Act (NWPCA), Neb. Rev. Stat. § 48-1201 *et seq.*, in two ways. Alegent seeks summary judgment on these claims.

#### 1.  *The Parties' Arguments*

Alegent understands Bjorman's NWPCA claims to be based on (1) failing to pay her for overtime, and (2) retaliating against her for complaining about "illegal activities." Filing 47-1 at 27. Alegent argues that it is entitled to summary judgment on the overtime payment claim because it is time-barred and because Bjorman admitted in her deposition that she was paid for all overtime she worked. Filing 47-1 at 27–28. Alegent argues that it is entitled to summary judgment on Bjorman's NWPCA retaliation claim because that claim was not cognizable under the NWPCA at the time of her termination. Filing 47-1 at 28–30. More specifically, Alegent argues that the NWPCA was amended to provide a cause of action for retaliation effective October 1, 2020, but that effective date is more than a year after Bjorman was discharged. Filing 47-1 at 29. Even if Bjorman could bring a retaliation claim under the NWPCA, Alegent argues that it is entitled to summary judgment on that claim for the same reasons it is entitled to summary judgment on Bjorman's FLSA retaliation claim. Filing 47-1 at 30.

---

[5] Additional ways to show pretext include "showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Engelhardt*, 918 F.3d at 979 (quoting *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1125–26 (8th Cir. 2017)). Bjorman has offered no evidence to support any such showings.

Bjorman contends that her NWPCA claim for unpaid wages is not about overtime, but about unpaid PTO hours. Filing 53 at 35–36. She claims that her NWPCA retaliation claim is cognizable, because the "clear intent" of the 2020 amendment was "to 'harmonize provisions' of the state's labor laws." Filing 53 at 36–37. She does not explain how that intent means that she can now assert a claim for which there was no statutory basis at the time of her termination. Bjorman also argues that summary judgment should be denied on her NWPCA retaliation claim for the same reasons it should be denied on her FLSA retaliation claim. Filing 53 at 37.

In reply, Alegent argues that Bjorman offers no evidence that Alegent did not follow the law to pay for earned but unused PTO upon the termination of employment or that it failed to do so between 2014 and 2016. Filing 61 at 8. Alegent argues that the undisputed facts are that Alegent "returned" and PTO hours that were "removed" from a timecard to the employee's PTO bank. Filing 61 at 8. Alegent also argues that there is no clearly expressed intent that the amendment to the NWPCA authorizing a retaliation claim was intended to be retroactive. Filing 61 at 8–9.

### 2. *Bjorman's NWPCA Claim Concerning Pay in Opposition to Summary Judgment Is Not the Claim Alleged in Her Complaint*

This NWPCA unpaid wages claim raises the same problem as Bjorman's FLSA claim concerning PTO. Once again, Bjorman's characterization of the NWPCA unpaid wages claim in response to Alegent's Motion for Summary Judgment is inconsistent with Bjorman's NWPCA claim concerning unpaid wages as pleaded in her Complaint.

Specifically, in Count II of her Complaint, Bjorman alleges that Alegent violated the NWPCA in part "by refusing to compensate Plaintiff in a manner required under said law for overtime work performed by the Plaintiff. . . ." Filing 1-1 at 8 (¶ 27). In support of its Motion for Summary Judgment Alegent alleges, "Plaintiff admits Alegent properly compensated her for all overtime hours worked, and there were no instances where Plaintiff worked over 40 hours a week

and was not paid overtime." Filing 47-1 at 10 (¶ 14). Bjorman responds, "Admit, in part. Plaintiff is not claiming damages for unpaid overtime but for unpaid wages." Filing 53 at 5 (¶ 14). This admission is contrary to the "overtime" basis for her NWPCA claim as pleaded in Count II of her Complaint.[6] Still further, Bjorman argues that the NWPCA requires payment of unpaid wages owed for earned and unused PTO. Filing 53 at 35. She also argues that Alegent "misconstrues" the NWPCA claims in this case by claiming that Bjorman was paid for all "overtime worked," when the claim is about unpaid PTO. Filing 53 at 36. Finally, she argues that PTO hours are defined as a wage under the NWCPA, so she is entitled to be paid for the PTO hours that were wrongfully removed from her paycheck during the years 2014 to 2016 and never paid to her. Filing 53 at 36.

The Court concludes that it is Bjorman who has "misconstrued" her NWPCA unpaid wages claim or more accurately "remanufactured" that claim in an attempt to defeat summary judgment. Again, "[t]he pleading requirements under the Federal Rules of Civil Procedure, while 'relatively permissive,' 'do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.'" *Wendt*, 971 F.3d at 821 (quoting *Singleton*, 934 F.3d at 837). The Court will not allow Bjorman to manufacture a NWPCA claim concerning PTO to attempt to defeat summary judgment that she did not plead in this case. Furthermore, Bjorman has expressly abandoned any NWPCA claim based on overtime pay by

---

[6] Of course, this admission also begs the question of exactly what part of Alegent's allegation is not admitted. Alegent alleges further, "Plaintiff admits she never complained about overtime pay; her complaint in 2016 was solely about PTO." Filing 47-1 at 10 (¶ 15). Bjorman responds, "Admit, in part. Plaintiff's complaint to Todd Hoffman, Defendants' Human Resources business partner for Bergan Mercy in 2016, was not 'solely about PTO'; rather, it was about Defendants' wrongful conduct in removing PTO hours from herself and other nurses in the NICU at Bergan Mercy who had not worked up to their required .9 FTE of 36 hours in a single week." Filing 53 at 5 (¶ 15). Thus, it appears that the part of Alegent's allegation that Bjorman admits is that "she never complained about overtime pay." Furthermore, it is not clear what distinction Bjorman is attempting to draw between her complaints to Alegent being "solely about PTO," as characterized by Alegent, and her complaints to Alegent being "about Defendants' wrongful conduct in removing PTO hours from herself and other nurses in the NICU at Bergan Mercy who had not worked up to their required .9 FTE of 36 hours in a single week," as she characterized it. The latter complaint is also undeniably "about PTO."

asserting that Alegent "misconstrued" the NWPCA claim for unpaid wages to be about overtime pay. Filing 53 at 36.

Thus, the Court never reaches the question of whether or not the NWPCA claim for unpaid wages is timely, because Alegent is entitled to summary judgment on that claim on other grounds.

### 3. No Reasonable Jury Could Find for Bjorman on Her NWPCA Retaliation Claim

The Court concludes that it need not reach the question of whether there was any statutory authorization—even a retroactive one—for Bjorman's NWPCA retaliation claim. This is so, because even if there was a statutory basis for the claim, no reasonable jury could find in Bjorman's favor on that claim in light of the evidence presented. *See Chapman*, 30 F.4th at 772 (stating this summary judgment standard).

Bjorman's argument that she has generated genuine issues of material fact on this claim is perfunctory at best. She simply cites to "the same reasons set forth" in her briefing of the FLSA retaliation issue. Filing 53 at 37. Likewise, for the same reasons that the Court explained Bjorman cannot generate genuine issues of material fact on the "pretext" requirement of her FLSA retaliation claim in Section II.B.3. above, Bjorman cannot generate genuine issues of material fact on the "pretext" requirement of her NWPCA retaliation claim. *Cf. Haffke v. Signal 88, LLC*, 947 N.W.2d 103, 116 (Neb. 2020) (explaining that an instruction on a NFEPA retaliation claim was correct where it stated, "You may find Defendant would not have [terminated or denied the independent contractor agreement] 'but for' Plaintiff's opposition to or refusal to carry out an unlawful practice of Defendant, if it has been proved that the Defendant's stated reasons for its decision[s] to [terminate the Plaintiff's employment or deny the independent contractor agreement] are not the real reasons, but are a pretext to hide retaliation.").

Alegent is entitled to summary judgment on both Bjorman's NWPCA unpaid wages claim and her NWPCA retaliation claim.

### D.  Bjorman's NFEPA and Public Policy Retaliation Claims

In Count III, Bjorman alleges that Alegent violated both the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101 et *seq.,* and Nebraska public policy when it "retaliated against the Plaintiff after she reported and/or opposed a practice and/or action of the Defendant which she believed was unlawful under state or federal law." Filing 1-1 at 9 (¶ 30). This claim appears to be consistent with Bjorman's claim of retaliatory discharge in her briefing of Alegent's Motion for Summary Judgment.

The parties' arguments reveal that whether summary judgment is appropriate on these claims ultimately turns on Bjorman's ability or inability to generate any genuine issues of material fact that Alegent's reasons for her termination are pretextual. *Compare* Filing 47-1 at 34 (arguing as to NFEPA "whistleblower retaliation" that Bjorman's employment was terminated for legitimate and nonretaliatory reasons entirely unrelated to any protected activity and that there is no evidence tending to show that Alegent's reason for terminating Bjorman's employment was mere pretext for retaliation), 36 (arguing as to a claim of retaliation in violation of public policy that Alegent has articulated a legitimate, non-retaliatory reason for Bjorman's termination and Bjorman cannot demonstrate such reason is pretextual), *with* Filing 53 at 39 (arguing that for the same reasons stated as to Bjorman's FLSA retaliation claim Bjorman has established a prima facie claim of retaliation under the NFEPA and that  there is a genuine issue of material fact as to whether Alegent's reasons for termination were merely a pretext for retaliation), 40 (arguing that even if the Court finds Bjorman did not establish retaliation claims under the FLSA or NFEPA, the evidence of Alegent's improper conduct in this case and disparate treatment of Bjorman

"certainly" contravenes the constitutional, statutory, and regulatory provisions of those Acts, which supports Bjorman's common law claim of retaliation).

The Nebraska Supreme Court has explained that an instruction on a NFEPA retaliation claim was correct where it stated, "You may find Defendant would not have [terminated or denied the independent contractor agreement] 'but for' Plaintiff's opposition to or refusal to carry out an unlawful practice of Defendant, if it has been proved that the Defendant's stated reasons for its decision[s] to [terminate the Plaintiff's employment or deny the independent contractor agreement] are not the real reasons, but are a pretext to hide retaliation." *Haffke v. Signal 88, LLC*, 947 N.W.2d 103, 116 (Neb. 2020). Similarly, the Nebraska Supreme Court has held that, where an employer offered a legitimate, permissible reason for discharge an employee, but the employee presented no evidence that the employer's reason was pretextual and not the true reason for the discharge, the employer was entitled to summary judgment on the employee's claim of discharge in violation of public policy. *O'Brien v. Bellevue Pub. Sch.*, 856 N.W.2d 731, 739–40 (Neb. 2014).

The Court will not belabor the matter. Again, for the same reasons that the Court explained Bjorman cannot generate genuine issues of material fact on the "pretext" requirement of her FLSA retaliation claim in Section II.B.3. above, Bjorman cannot generate genuine issues of material fact on the "pretext" requirement of her NFEPA retaliation claim or her claim of retaliatory discharge in violation of public policy.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Alegent's August 26, 2022, Motion for Summary Judgment, Filing 47, is granted. Judgment shall enter in favor of Alegent and against Bjorman on all claims in her Complaint.

Dated this 6th day of January, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge